UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

UNITED STATES OF AMERICA

V.                                                                                   CRIMINAL NO. 3:24-CR-77-DPJ-LGI

COREY PENDLETON

ORDER

Defendant Corey Pendleton is accused of being a felon in possession of a firearm. Pendleton believes the arresting officers lacked reasonable suspicion to detain him and moves [37] to suppress the resulting evidence. Though he initially sought a hearing, Pendleton withdrew that request in his reply. As explained below, the motion is denied.

I.      Facts

On November 16, 2023, Pendleton was questioned and then arrested for being a felon in possession of a firearm. The Government submitted two body-cam videos to support its opposition to Pendleton's motion. *See* Conventional Filing [40]. Based on those videos, the Court finds these facts.

Around 7:30 p.m., Pendleton was working security outside a convenience store in a high-crime area. He was spotted by Jackson Police Department Captain Warren Hull with an AR-15 rifle slung over his shoulder. It was dark outside, and the store had protective bars on the windows. Pendleton was not wearing a uniform or anything else suggesting that he was security. He wore camo pants, a dark shirt, and a dark jacket.

Captain Hull approached without activating his blue lights and, in a friendly voice, asked Pendleton whether he was security. He added, "We get calls and stuff." Captain Hull then said, "I'm just going to talk to you." To which Pendleton responded, "Yes sir." Captain Hull and two

other officers on the scene were in uniform, but they neither brandished their weapons nor physically tried to restrain Pendleton.

As Detective Rakasha Collins approached, Captain Hull told Pendleton he needed to remove his weapon and said, "We're going to pat you down, ok?" Pendleton immediately said, "Yes." He then lifted his shirt to show he had nothing hidden. Detective Collins patted Pendleton down for officer safety.

From this point, Captain Hull walked into the store to ask the attendants whether Pendleton was security. Pendleton's movement was not restricted, and at one point he too walked into the store. The attendants confirmed his employment, and Captain Hull asked Pendleton for identification. Pendleton denied having any, at which point Detective Collins asked, "What about in your wallet." Pendleton responded that he had no identification in his wallet, but he didn't check, and his facial expressions and body language clearly changed. Detective Collins didn't believe him and told him to "pull it out." Pendleton complied; his Social Security card was in the wallet's windowpane. A third officer, who never appears to have spoken to Pendleton, then called in the number to confirm his identity. At that point, Pendleton knew they were running his identification, so he identified himself to Captain Hull and admitted that he was on parole.

Pendleton argues that "possessing or carrying a rifle is allowed not only by the Second Amendment to the United States Constitution, but also by Mississippi state law." Def.'s Mot. [37] at 3. Therefore, according to him, there was no reasonable suspicion to detain him.

II.   Legal Standards

The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be

2

violated." U.S. Const. amend IV.   When "the government searches or seizes a defendant without a warrant, the government bears the burden of proving, by a preponderance of the evidence, that the search or seizure was constitutional." *United States v. Guerrero-Barajas*, 240 F.3d 428, 432 (5th Cir. 2001).

To trigger the Fourth Amendment, the officers must seize the defendant.  By contrast, "[c]onsensual encounters 'may be initiated by the police without any objective level of suspicion,' and during such encounters, officers 'may ask questions of the person, ask for identification, and request permission to search' an individual or one's personal effects." *United States v. Smith*, No. 22-50045, 2023 WL 4265789, at *3 (5th Cir. June 29, 2023) (quoting *United States v. Cooper*, 43 F.3d 140, 145 (5th Cir. 1995) *and then United States v. Williams*, 365 F.3d 399, 404 (5th Cir. 2004)).

> A seizure occurs when, under the totality of the circumstances, a law enforcement officer, by means of physical force or show of authority, terminates or restrains a person's freedom of movement. *Florida v. Bostick*, 501 U.S. 429, 434 . . . (1991).  The test that applies in the absence of an unambiguous intent to restrain or upon a suspect's passive acquiescence is whether "in view of all of the circumstances . . . , a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 . . . (1980). And the Court added to this test that when a person "'has no desire to leave' for reasons unrelated to the police presence, the 'coercive effect of the encounter' can be measured better by asking whether 'a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." *Brendlin v. California*, 551 U.S. 249, 255 . . . (2007) (citing *Bostick*, 501 U.S. at 435–36).

*United States v. Flowers*, 6 F.4th 651 (5th Cir. 2021).

Four non-exclusive factors help determine whether a consensual encounter has occurred: "(1) the threatening presence of several police officers; (2) the display of a weapon by an officer; (3) physical touching of the person of the citizen; and (4) the use of language or tone of voice

3

indicating that compliance with an officer's request was compelled." *United States v. Guevara*, 448 F. App'x 453, 456 (5th Cir. 2011).

If a seizure occurred, then the Fourth Amendment applies and, under the facts of this case, the Court must determine whether the officers conducted a proper *Terry* stop. *Terry v. Ohio*, 392 U.S. 1 (1968). A *Terry* stop—or "[a] temporary, warrantless detention of an individual"—"must be justified by reasonable suspicion that criminal activity has taken or is currently taking place." *United States v. Garza*, 727 F.3d 436, 440 (5th Cir. 2013). "Reasonable suspicion 'requires more than merely an unparticularized hunch, but considerably less than proof of wrongdoing by a preponderance of the evidence.'" *Id.* (quoting *United States v. Gonzalez*, 190 F.3d 668, 671 (5th Cir. 1999)). "Reasonable suspicion sufficient to justify a *Terry* stop exists when law enforcement officials are able to point to 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.'" *United States v. Webster*, 162 F.3d 308, 332 (5th Cir. 1998) (quoting *Terry*, 392 U.S. at 21).

This is a two-step inquiry. First, the stop must be "justified at its inception." *United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004) (en banc). Second, the officer's subsequent actions must be reasonably related to that justification. *United States v. Pack*, 612 F.3d 341, 349-50 (5th Cir. 2010). "[I]f additional reasonable suspicion arises in the course of the stop and before the initial purpose of the stop has been fulfilled, then the detention may continue until the new reasonable suspicion has been dispelled or confirmed." *United States v. Lopez-Moreno*, 420 F.3d 420, 431 (5th Cir. 2005).

III. Analysis

Pendleton was not initially seized. There were three officers present, only two of whom said anything to Pendleton. That does not reflect a threatening presence. *See Guevara*, 448 F.

4

App'x at 456 (5th Cir. 2011) (holding that 8 to 12 officers did not create threatening presence when only two talked to the defendant); *United States v. Scott*, No. 3:08-CR-134-DPJ-LRA, 2015 WL 4506864 (S.D. Miss. July 24, 2015), *aff'd*, 624 F. App'x 850 (5th Cir. 2015) (finding no threatening presence by five or six officers); *United States v. Booker*, No. 4:16-CR-113, 2016 WL 7471322, at *3 (N.D. Miss. Dec. 28, 2016) (finding no threatening presence when three officers were present); *United States v. Ardoin*, No. CRIM.A. 10-29-JJB-CN, 2010 WL 4056191, at *4 (M.D. La. Oct. 14, 2010), aff'd, 454 F. App'x 385 (5th Cir. 2011) (no threatening presence by six officers).

Also, "[t]here is no evidence weapons were brandished or officers touched" Pendleton other than the consensual pat down. *Guevara*, 448 F. App'x at 456 (affirming finding of consensual encounter); *see also Smith*, 2023 WL 4265789, at *4 (noting "officer[s] never reached for or brandished a weapon"). As for the pat down, an officer "may . . . request permission to search." *Id.* (quoting *Williams*, 365 F.3d at 404); *see also Cooper*, 43 F.3d at 147 (holding that search was consensual). That's what happened here.

As for language or tone of voice, the encounter started friendly and remained that way until the end. Voices were never raised and nothing coercive was said. In fact, Pendleton and the officers were joking with each other, and he walked freely in and out of the store. Based on all that, the Court finds that Pendleton was not seized when Captain Hull first requested identification, which he was entitled to do. *Cooper*, 43 F.3d at 145.

Things did change slightly at that point. When Pendleton told the officers he didn't have any identification, he patted his front pockets. But Detective Collins had seen his wallet in his back pocket and didn't believe him. She then directed him to "pull it out." Reasonable suspicion existed at that point, and the command was related to it.

5

"[W]hile the mere presence of a firearm in an open carry jurisdiction does not itself create reasonable suspicion of criminal activity, the presence of a firearm taken together with the 'high-crime area,' the 'time of night,' and other factors created reasonable suspicion." *United States v. McMillion*, 101 F.4th 573, 577 (8th Cir. 2024), *cert. denied*, 145 S. Ct. 403 (2024) (quoting *United States v. Trogdon*, 789 F.3d 907, 913 (8th Cir. 2015)); *see also United States v. Hill*, 752 F.3d 1029, 1035 (5th Cir. 2014).

There were other facts here. Pendleton was seen carrying an assault rifle in front of a convenience store with barred windows in a high-crime area at night. *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (noting that "'high crime area' is among the relevant contextual considerations in a *Terry* analysis"); *Flowers*, 6 F.4th at 657 ("Convenience stores are a type of establishment known to be frequent targets for theft, robbery, and burglary"). Granted, the attendants said Pendleton was security, but a reasonable officer might still confirm that all was alright. And it's apparent from the video that Pendleton's demeanor changed when asked for identification; he became evasive and nervous. *See Rincon v. City of Laredo*, No. 24-40168, 2025 WL 603883, at *3 (5th Cir. Feb. 25, 2025) (noting among other factors that suspect refused to identify himself); *see also United States v. Bass*, No. 20-10588, 2021 WL 1882574 at *5 (5th Cir. May 11, 2021) (noting among other factors that defendant did not have identification); *Cooper*, 43 F.3d at 147 (same).

Assuming Pendleton was seized once instructed to remove his wallet, reasonable suspicion existed by then. And "[a]n officer may check an individual's identification in his wallet during a [*Terry*] stop." *Emesowum v. Cruz*, 756 F. App'x 374, 381 n.3 (5th Cir. 2018) (quoting *United States v. Brown*, 366 F.3d 456, 461 (7th Cir. 2004)); *see also Rincon*, 2025 WL

6

603883, at *4; *Cooper*, 43 F.3d at 147 (finding that consensual encounter "transformed into a limited *Terry* detention").

IV.     Conclusion

The Court has considered all arguments. Those not addressed would not have changed the outcome. Pendleton's motion to suppress [37] is denied.

**SO ORDERED AND ADJUDGED** this the 4th day of August, 2025.

                                                 s/ *Daniel P. Jordan III*
                                                 UNITED STATES DISTRICT JUDGE